### BUTLER et al. v. BURCH PLOW CO.

Circuit Court of Appeals, Ninth Circuit.
October 31, 1927.

Rehearing Denied January 5, 1928.

No. 4853.

1. Patents ⬤═328—1,233,107, claims 1, 2, 3, and 4, for road-building machine, held valid and infringed.

Myers patent, No. 1,233,107, claims 1, 2, 3, and 4, for road-building machine, *held* valid, as against claim of anticipation, and infringed.

2. Patents ⬤═328—1,401,149, claims 2, 3, 7, 8, and 9, for combined spreader and roller, held valid and infringed.

Foster patent, No. 1,401,149, claims 2, 3, 7, 8, and 9, for combined spreader and roller for road construction, *held* valid and infringed.

3. Patents ⬤═328—1,470,157, claims 1–7, for stone spreader, held valid and infringed.

Fike patent, No. 1,470,157, claims 1–7, for stone spreader for road construction work, *held* valid and infringed.

4. Patents ⬤═51(1)—Test of "anticipation" is whether patentee has added anything to human knowledge, and made world's work easier, cheaper, or safer.

The test of "anticipation" is whether patentee has added anything of value to the sum of human knowledge, whether he has made the world's work easier, cheaper, and safer, so that return to prior art would be a retrogression.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Anticipation.]

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Edward J. Henning, Judge.

Patent infringement suit by the Burch Plow Company against Mark M. Butler and others. Decree for plaintiff, and defendants appeal. Affirmed.

Raymond Ives Blakeslee, of Los Angeles, Cal., for appellants.

Lacey & Lacey and R. W. Bishop, all of Washington, D. C., and Ford W. Harris, of Los Angeles, Cal., for appellee.

Before RUDKIN, Circuit Judge, and SAWTELLE and JAMES, District Judges.

SAWTELLE, District Judge. This is a suit for infringement of letters patent No. 1,-233,107, for a road-building machine, dated July 10, 1917, issued to Rolla M. Myers, and assigned to appellee; of patent No. 1,401,-149, for combined spreader and roller, dated December 27, 1921, issued to appellee, as assignee of Harry C. Foster; and of patent No. 1,470,157, for a stone spreader, dated October 9, 1923, issued to appellee as assignee of Joseph L. Fike.

It is alleged in the complaint that the inventions, covered by said letters patent, are capable of joint use, and are intended to be jointly used in road machines, manufactured and sold by appellee, and in similar machines manufactured and sold by appellants, and that the appellee is now the sole owner of said letters patent, and all the rights thereunder, including the right to recover for past infringement; that the appellants jointly and severally infringed said letters patent and each of them by making, selling, and using, or causing to be made, sold, and used, machines containing the inventions of said letters patent and the claims thereof. The bill of complaint contains the usual allegations of irreparable damage and injury to the appellee by reason of said infringement, as well as the usual prayer for injunctive relief and damages.

The appellants have denied the material allegations of the bill of complaint, and have pleaded certain separate and alternative defenses, among others that said letters patent, and each of same, are void for aggregation, the subjects of none of same and the claims of none of same reflecting or amounting to invention; that such machines or devices, or instrumentalities, as appellants have made and sold, embody and contain and reflect invention and acts of invention totally distinct and different from the inventions of said letters patent, being in part the inventions of the appellant Butler, for which inventions application for letters patent of the United States have heretofore been filed by him, and which inventions are to be distinguished patentably from said alleged inventions of said letters patent mentioned in the bill of complaint; and that appellee's patents were anticipated in and by numerous prior letters patent of the United States and in foreign countries.

The lower court entered an interlocutory decree in favor of the appellee, plaintiff below, and this case comes here on appeal from that order.

Appellee began the manufacture of the stone spreader and distributer in the year 1917. The value in money of the machines so manufactured amounts to approximately $320,000. The total number of machines so manufactured, up to the time of the commencement of this suit, is slightly in excess of 1,000 machines.

The evidence shows that, prior to the time appellee's machine came into general use throughout the United States, the prevailing method of distributing road material on the roadway was to dump it out of the truck or wagon and distribute it over the surface of the road by hand. This method was inefficient, expensive, and unsatisfactory, it being almost impossible to distribute evenly the different grades of material over the road, or to distribute same to a given thickness; whereas, by the use of appellee's spreader, which regulated the amount of material to be placed on the road, the proper amount of such material could be distributed evenly and without any guesswork, and this regardless of the condition of the subgrade. Under proper conditions, 2 men on the spreader did the same work that 14 men did by hand.

Appellee insists that the patents in suit are in themselves prima facie evidence of validity, and of the truth of the facts therein stated. On the other hand, the appellants contend that the issuance of the patents to Butler creates a prima facie presumption of the patentable difference from that of the appellee's patents. We think it unnecessary to review the many authorities cited in support of these propositions. It will suffice to quote from the opinion of the Supreme Court in the case of Corning et al. v. Burden, 15 How. (56 U. S.) 252, 270 (14 L. Ed. 683):

"It is evident that a patent, thus issued after an inquisition or examination, made by skillful and sworn public officers, appointed for the purpose of protecting the public against false claims or useless inventions, is entitled to much more respect, as evidence of novelty and utility, than those formerly issued without any such investigation. Consequently, such a patent may be, and generally is, received as prima facie evidence of the truth of the facts asserted in it. And in cases where the evidence is nicely balanced, it may have weight with a jury in making up their decision as to the plaintiff's right; and, if so, it is not easy to perceive why the defendant who uses a patented machine should not have the benefit of a like presumption in his favor, arising from a like investigation of the originality of his invention, and the judgment of the public officers, that his machine is new, and not an infringement of the patent previously granted to the plaintiff. It shows,

at least, that the defendant has acted in good faith, and is not a wanton infringer of the plaintiff's rights, and ought not, therefore, to be subjected to the same stringent and harsh rule of damages which might be justly inflicted on a mere pirate. It is true the mere question of originality or infringement generally turns on the testimony of the witnesses produced on the trial; but, if the plaintiff's patent in a doubtful case may have some weight in turning the scale in his favor, it is but just that the defendant should have the same benefit from his; 'valeat quantum va-leat.' The parties should contend on an equal field, and be allowed to use the same weapons.''

The Myers Patent, No. 1,233,107.

The invention as described in this patent is set forth in the second paragraph of the specification:

"My invention is an improvement in road-building machines, and has for its object to provide a machine of the character specified, especially adapted for distributing and leveling stone, slag, or gravel on roadways, wherein the distributer is adapted to be drawn be-

Fig. 1.

Fig. 2.

Fig. 3.

hind a truck and to receive material from the truck, and to distribute a uniform layer of material on the roadway as the truck moves along."

The patent discloses a structure comprising what is described in the specification as a hopper-shaped casing, consisting of front and rear walls *2* and *3*, and end walls *4*; the top of the casing, as shown in the drawings, is open so as to permit the flow into it of the material from the dumping truck. Approximately one-half of the rear wall of the casing is omitted, namely, the lower portion of the said wall, and the opening so formed, together with the open bottom, forms the outlet through which the stone passes onto the roadway. This opening is narrower than the opening at the top, due to the fact that the rear wall is practically vertical, while the front wall inclines upward at an angle.

Shoes *7* and *8* and wheels *14* act as support for the structure and prevent it from sinking into the soft ground. The structure is attached to the truck by chains *11*, fastened to said shoes. These chains have hooks *12* at their forward ends, and the hooks are adapted to engage eyes *13* on the rear axle of the truck *1*. The operation of the device is described as follows:

"The hopper is placed on the roadway, as shown in Fig. 1, and the truck is backed up into position before it, as shown in Figs. 2 to 5. The chains *11* are connected with the eyes *12*, and the end gate of truck is opened

partially, as shown, to permit the material to flow into the hopper. The gate is already regulated to discharge the proper thickness of stone, and as the truck moves forward, dragging with it the hopper, the stone in the hopper, because of the friction with the road-bed, passes out at the rear of the hopper, and will be leveled by the lower edge of the gate. The distributer delivers the material at a uniform depth and width, and the ends of the hopper serve to gage the width of the material delivered.

"The improved distributer may be used in any connection wherein it is desired to distribute a uniform layer of material, and it will handle slag or gravel as readily as stone."

Patentee claims:

"1. A road-building machine, comprising a hopper-shaped container having front and rear walls diverging toward the open top of the container and having an open bottom, wheels on the front wall near the bottom, a sliding shoe secured to each end of the container transversely of the bottom, the rear wall having a discharge opening the full length of the said wall and communicating with the open bottom, a gate adjustably mounted on the front wall for partially closing the discharge opening, and chains connected with the shoe and having hooks for engaging a truck for delivering material into the hopper.

"2. A road-building machine, comprising a hopper-shaped container having an open bottom and open at the top and adapted to be drawn behind a truck containing material delivering into the container, said container having a discharge opening in its rear wall communicating with the open bottom, means for regulating the height of the discharge opening, sliding shoes at the ends of the bottom of the hopper, and draft mechanism connected with the sliding shoes.

"3. A road-building machine, comprising a container having an opening in its bottom and having a discharge opening in its rear wall, communicating with the opening in its bottom, means for regulating the height of the discharge opening, sliding shoes at the ends of the bottom of the container, and draft mechanism connected with the shoes.

"4. A road-building machine, comprising a container having an opening in its bottom and having a discharge opening in its rear wall, communicating with the opening in its bottom, means for regulating the height of the discharge opening, and sliding shoes at the ends of the bottom of the container."

The structure is shown in the drawings:

The Foster Patent, No. 1,401,149.

As stated in the specification:

"This invention relates to a distributer for soil, gravel, sand, or other like materials, and more particularly to a drag or depositor for uniformly regulating the deposits of road-building material, concrete material, or like purposes. * * *

"A further object of the invention is to provide improved means for regulating the shape and extent of the deposited mass of material, and to further provide in such apparatus means for surfacing or preparing the roadbed, ground, or other surface preparatory to receiving the deposited materials."

This patent discloses a hopper-like structure similar to that of the Myers patent. "The present invention, however, embodies improved means for regulating the shape and extent of the deposited mass of material and the use of a pressure roller for preparing the surface to receive such deposits."

"Pivotally mounted in the skids 4 and extending transversely across the apparatus, and immediately in front of the divergent front wall 2, is a pressure roller 5. As shown in Fig. 2 this pressure roller 5 extends somewhat below the lower edge of the skid. Inasmuch as the roller 5 is located beneath the inclined forward side 2, it approaches quite closely to the vertical plane of the center of gravity of the hopper when loaded. The construction is such that the hopper 1 rides primarily upon the roller 5 with the rear ends of the skids trailing upon the ground. The skids not only limit the tilting movement of the hopper, and prevent it being upturned, but also facilitate the movement of the device over depressions or ridges and uneven surfaces. The construction is such that the roadbed or receiving surface is compressed by the roller action, as the drag is moved forward. The surfacing action is effected immediately in advance of the deposit of material from the hopper."

The claims involved herein and the drawings are as follows:

"2. In an apparatus of the character described, a movable hopper to receive the material to be distributed, a discharge opening leading therefrom, through which the material is discharged in uniform measured mass, and a transversely arranged roller positioned in advance of the hopper, to prepare the surface operated over to receive the discharged material.

"3. In an apparatus of the character described, a movable hopper to receive the material to be distributed, the rear wall of said

hopper terminating above the surface operated upon, to afford a discharge opening for the material, a gate adjustably mounted on the hopper and adapted to be projected different distances below the lower edge of the said rear wall, to regulate the capacity of the discharge opening, and a transversely arranged roller operating in advance of the hopper, to prepare the surface operated upon to receive the discharged material."

"7. In an apparatus of the character described, a container for the material to be distributed, means for regulating the discharge of material, and a road-surfacing member subjected to the pressure of the load of material within the container operating in advance of the point of discharge of the material from the container.

"8. In an apparatus of the character described, a container for the material to be distributed, means for regulating the discharge of material, and a road-surfacing roller subjected to the pressure of the contents of the container engaging the surface operated over in advance of the point of discharge.

"9. In a material dispensing apparatus,

## DRAWINGS.

a traveling container for the material, means for regulating the shape and proportion of the deposit of material and surfacing means moving in unison with the container for preparing the surface operated over to receive the deposit."

### The Fike Patent, No. 1,470,157.

The specification sets forth:

"This invention relates to an improved stone spreader of the character illustrated in patent No. 1,233,107, granted to R. M. Myers, July 10, 1917, as well as patent No. 1,281,-141, granted to W. J. Coultas, October 8, 1918, and seeks, as one of its principal objects, to provide a stone spreader of this nature so constructed that succeeding courses of stone may be so spread by the device that the stone at the points where the courses join will be of a depth equal to the major depth of the courses, so that a uniform distribution of stone may be had.

"A further object of the invention is to provide a stone spreader, the end portions of which will be formed to clear or pass over a course of stone, so that, after one course of stone has been spread, one end of the spreader may be disposed to overhang said course in spreading a succeeding course, for depositing the stone at the point where the courses join uniformly with the major depth of the courses.

"And the invention has as a still further object, to provide a stone spreader having end gates which may be adjusted to control the lateral distribution of the stone."

Neither the Myers nor the Foster patent has any provision for the overhang over a previously distributed course, nor for the lateral discharge opening at the end of the casing.

The claims of this patent involved herein and the drawings are as follows:

"1. A road-building spreader, including a casing open at its top and bottom, means supporting the casing for movement over a roadway, and means for connecting the casing to a vehicle whereby the vehicle may discharge into the casing, the casing being formed at its ends to provide road clearance greater than the clearance at the intervening portion of the casing.

"2. A road-building spreader, including a casing open at its top and having front and back walls, a gate carried by the back wall, means supporting the casing for movement over a roadway, and means for connecting the casing to a vehicle, whereby the vehicle may discharge into the casing, the casing being formed at its ends to provide road clearance greater than the clearance at the intervening portion of the casing.

"3. A road-building spreader, including a casing open at its top and bottom, means supporting the casing for movement over a roadway, and means for connecting the casing to a vehicle, whereby the vehicle may discharge into the casing, the lower edges of the casing being stepped to provide increased road clearance at the ends of the casing.

"4. A road-building spreader, including a casing open at its top and having front and back walls, a gate carried by the back wall, means supporting the casing for movement over a roadway, and means for connecting the casing to a vehicle, whereby the vehicle may

### DRAWINGS.

discharge into the casing, the lower edges of the casing being stepped to provide increased road clearance at the ends of the casing.

"5. A road-building spreader, including a casing open at its top and bottom and having front and back walls, a gate adjustable upon the back wall, means supporting the casing for movement over a roadway, and means for connecting the casing to a vehicle, whereby the vehicle may discharge into the casing, the lower edges of the casing being stepped to provide increased road clearance at the ends of the casing.

"6. A road-building spreader, including a casing open at its top and bottom and having end walls provided with discharge openings, gates normally closing said openings, means supporting the casing for movement over a roadway, and means for connecting the casing to a vehicle, whereby the vehicle may discharge into the casing.

"7. A road-building spreader, including a casing open at its top and bottom and provided with end walls having discharge openings, gates adjustable upon said end walls to control discharge through the openings, means supporting the casing for movement over a roadway, and means for connecting the casing to a vehicle, whereby the vehicle may discharge into the casing."

Fig. 2.

Fig. 3.

The Butler Patent, No. 1,581,784.

As stated in the specifications:

"This invention relates to road-building machinery, and especially to devices for supplying surfacing materials to roadways in a continuous, even, and automatic manner.

"The invention is designed particularly to deposit a hot asphaltic concrete mix upon roadways and spread same evenly and continuously.

"As now practiced, asphaltic concrete, mixed in some central plant, is conveyed to the street or other point of deposit, where the contents of the conveyance are dumped. The load thus deposited is then shoveled and raked by hand labor to the depth required and desired. Owing to the difficulty and almost impossible work of obtaining a regular and even surface by hand raking and manual labor in general, road and roadways built on this plan are uneven, undulating, and irregular, and unable to sustain the wear of traffic and retain a desirable even surface.

"The object of this invention, therefore, is to obviate this need of manual attention to the hot concrete mix deposited upon the roadbed, and to provide a simple and effective means for automatically spreading the prepared mix over a roadbed in any desired thickness, evenly and expeditiously. * * *

"The invention, as shown in a preferred form in the drawing, embodies a receiver 1, into which is arranged to be deposited the asphaltic mix. The receiver 1 is provided with side walls 2, a rear wall 4, and a bottom 5, which inclines to the rear of the receiver and terminates in an apron 6, which as seen in Figs. 2, 3, and 4, extends below the rear wall 4 and side walls 2 of the receiver, providing between such apron and rear wall 4 a longitudinally extending throat 7, the transverse area of which is arranged to be determined by a blade 8, which, as pointed out presently, is operable upon and relative to said rear wall 4. The rear wall 4 is inclined to the vertical, and co-operates with the inclined bottom 5 in discharging the contents of the receiver."

The claims and drawings are set forth in full in the margin.[1]

The Butler Patent, No. 1,605,094.

The specification states:

"My invention relates to a means for laying mineral aggregates in the building of roadways, and it has particular reference to a device for delivering upon a surface in a continuous manner a regulable mass of material discharging from a container.

"Various objects are aimed at by this invention, and the most important of them may be stated to be the provision of a device of this character, in which the material to be laid is received, and from which it discharges by natural gravitation in an uninterrupted flow while in motion, in which the material during the passage therefrom onto the ground offers no impedance to the free draft of this device, in which the mineral aggregates or other contents leave the device substantially by rolling motion and in frictionless manner, thereby preventing any dragging of the material laid, with the inevitable consequences of uneven or irregular deposit, and in which the entire weight of the material is sustained by and within the container, and from which a definite amount is paid out for a required surface.

"Another object of the invention is to provide a device of this character, which may be supported entirely above and free of the surface over which it is to be moved by means having rolling contact with the surface, whereby the loaded device may freely follow any direction of the vehicle by which it is drawn. * * *

"My invention consists of a container adapted to receive the charge of, and to be drawn by, a vehicle, and to lay its contents upon the ground or other surface during the movement of the container over the surface. It consists, further, of a container which is supported freely above the surface to be traversed and supplied thereby by means having rolling or frictionless contact with the surface, and which feeds out the contents in regulated continuous stream. Attention is hereby called to many devices known in this art, in which hoppers having open bottoms are employed for distributing purposes, and in which skids are used either entirely or partly as supports for the hoppers. My experience has shown that devices with open bottoms act merely as inclosures for guiding the mass of aggregates without sustaining any of its weight, which is carried entirely by the ground or surface to be laid; consequently the movement of the inclosure over the ground is resisted by the superimposed mass, which therefore must be dragged over the portion contacting the ground.

"One of the main objects of this invention, therefore, is to provide a device in which the material deposited therein may be laid in a continuous stream, without dragging the same and producing unevenness in the layer."

The claims and drawings of the patent are also set forth in the margin.[2]

---

1. See Appendix 1 at end of case.

2 See Appendix 2 at end of case.

[1-4] Appellants insist that the three patents in suit are invalid, in view of the prior art. The Circuit Court of Appeal for the Second Circuit has said that the principal question in cases of this character is:

"Has the patentee added anything of value to the sum of human knowledge? Has he made the world's work easier, cheaper and safer? Would the return to the prior art be a retrogression? When the court has answered this question, or these questions, in the affirmative, the effort should be to give the inventor the just reward of the contribution he has made. The effort should increase in proportion as the contribution is valuable. Where the court has to deal with a device which has achieved undisputed success and accomplishes a result never attained before, which is new, useful, and in large demand, it is generally safe to conclude that the man who made it is an inventor. The court may resort to strict, and it may even be to harsh, construction, when the patentee has done nothing more than make a trivial improvement upon a well-known structure which produces no new result; but it should be correspondingly liberal when convinced that the patentee's improvement is so radical as to put the old methods out of action. The courts have frequently held that one who takes an old machine, and by a few even inconsequential changes compels it to perform a new function, and do important work which no one before ever dreamed it capable of performing, is entitled to rank as an inventor." O'Rourke Engineering Const. Co. v. McMullen (C. C. A.) 160 F. 933, 938.

"The keynote of all the decisions is the extent of the benefit conferred upon mankind. Where the court has determined that this benefit is valuable and extensive, it will, we think, be difficult to find a well-considered case where the patent has been overthrown on the ground of nonpatentability." O'Rourke Engineering Const. Co. v. McMullen, supra.

In the same case the court quotes from Hobbs v. Beach, 180 U. S. 383, 392, 21 S. Ct. 409, 413 (45 L. Ed. 586), as follows: "* * * While none of the elements of the Beach patent—taken separately, or perhaps even in a somewhat similar combination —was new, their adaption to this new use and the minor changes required for that purpose resulted in the establishment of practically a new industry, and was a decided step in advance of any that had theretofore been made."

"In administering the patent law, the court first looks into the art to find what the real merit of the alleged discovery or invention is, and whether it has advanced the art substantially. If it has done so, then the court is liberal in its construction of the patent to secure to the inventor the reward he deserves. If what he has done works only a slight step forward, and that which he says is a discovery is on the border line between mere mechanical change and real invention, then his patent, if sustained, will be given a narrow scope, and infringement will be found only in approximate copies of the new device. It is this differing attitude of the courts toward genuine discoveries and slight improvements that reconciles the sometimes apparently conflicting instances of construing specifications and the finding of equivalents in alleged infringements. In the case before us, for the reasons we have already reviewed, we think that Eibel made a very useful discovery, which has substantially advanced the art. His was not a pioneer patent, creating a new art; but a patent which is only an improvement on an old machine may be very meritorious and entitled to liberal treatment." Eibel Co. v. Paper Co., 261 U. S. 45, 63, 43 S. Ct. 322, 328 (67 L. Ed. 523).

"The defendant claimed that the complainant's device was anticipated by the prior art. To authorize the allowance of a patent, there must be a substantial difference in principle from prior inventions. To amount to anticipation it is essential that there should be identity in substance, and the two things must accomplish the same purpose by substantially the same means, operating in substantially the same way. And a patentee's claim to an invention is anticipated when it appears that another made the invention before the date when the patentee made it. The anticipation may consist of prior patents or publications. And if prior invention is shown to have existed and been in use, it is clearly of no consequence whether it was patented or not. In the case at bar our attention has been called to a number of prior patents which defendant alleges show that the complainant's device was anticipated. But an examination of the patents referred to convinces us that there is absolutely nothing in the claim of anticipation by the prior art. The prior patents do not disclose or in any way suggest the invention of the patent in suit." Boyce v. Stewart-Warner Speedometer Corporation (C. C. A.) 220 F. 118, 124.

### As to the Prior Art.

The British patent to Stone, No. 1,115, is for "an improved system of casting or moulding applicable to ceilings, internal and external walls, roads, navigable vessels, and

other large surface structures." It was issued in 1872, and describes a traveling hopper, mounted on wheels and operated on rails, and which contains material to be deposited upon the roadway. The specification contains the following statement:

"This invention relates to casting or moulding surface structures in position by means of dies or moulds, and consists of an improved system of arranging and filling the moulds, and keying or attaching the moulded sections together. The moulded work is formed in the position it is intended to remain in, such as ceilings, roofs, the covering of walls, forming of chimney pieces, skirtings, mouldings, and so forth, in contradistinction of first moulding or casting them, and then fixing them in the position they are intended to permanently remain in.

"In applying this invention to horizontal surfaces, such as foot or road ways, promenades, and other similar surfaces, the moulds are turned face downwards, and held up a sufficient distance above the foundation to admit of the requisite quantity of surfacing material to be run underneath. The mould in this case is formed with an orifice with a hopper mouth for running in the plastic material.

"In lieu of using the moulds for horizontal surfaces, plastic material may be run on in sections by means of using dovetail rails or guide pieces and a roller, which roller is formed with a scraper or leveler running in front and a hopper-shaped feeder. The roller runs on the rails or guides feeding the fluid, then scraping or leveling it, and then rolling and setting it. These rollers may be formed with collars or projections leaving grooves or gutters in the work. When one section is rolled and set the rails are removed, replaced, and again laid parallel to the work, and the action repeated, the plastic material entering into the dovetail groove left by the rail, and thus keying or attaching to the completed work.

"In the case of roadways, the grooves formed by the roller may be filled in with wood or other elastic material to prevent draught animals from slipping."

There seems to be a vast difference in this patent and the patents in suit. It does not seem to contemplate the use of a spreader in connection with a vehicle or truck containing the material to be used on the roadway, as described in the said three patents, or either thereof, nor is it capable of such use.

The Schellenger patent, No. 1,029,894, is for a distributer for dumping wagons and cars, issued June 18, 1912. In this patent provision is made for the delivery of the road material in advance of the rear wheels of a horse-drawn vehicle, and not from a machine used in combination with a motor truck, which truck delivers the material at the rear.

In the first place, the Schellenger machine is so constructed that it cannot lay the material in width as great as the width between the wheels of the wagon. Figure 2 of the drawing illustrates this. In the second place, it is not clear how the space or channel between the strips of roadbed is to be filled. The specification provides: "These intervals between the first-named strips of roadbed may be afterward filled to a uniform depth by driving the wagon upon the parallel strips of road-making material first distributed, and by turning up the side boards 38, as previously described. Fig. 2 shows a cross-section of a roadbed with two parallel strips of road-making material, so placed as to leave an interval between the strips, which interval may be afterward filled as above described."

Such a device could not compare favorably with or anticipate the patents in suit, or provide for a uniform distribution of the road material along the roadway. In the machine of the Myers patent in suit the adjoining layers of material are close together, thus avoiding the necessity of hand labor, or of driving the wagon over parallel strips of road-making material as above provided in the Schellenger patent.

The evidence in the case, as well as the specifications and drawings of the Myers and Schellenger patents, show a decided structural difference. We therefore conclude that the Schellenger patent is not pertinent to the Myers disclosure and does not anticipate the same; furthermore, that the teaching of the patents in suit is not carried out in either of these two patents, or in any of the other patents cited as constituting or shown in the prior art.

One of the witnesses in the case has correctly stated: "There is nothing in the prior art which anticipates the fundamental idea of the Myers patent, of a combination of a dumping truck, with a distributing machine located at the rear of the truck, so that the material falling from the truck will fall into it, and in contact with the ground, and as a leveling device or gauge which determines the thickness of the material spread upon the ground."

This patent does not disclose "the fundamental idea of the Myers patent, of the combination of dump vehicle—whether horse or motor drawn is immaterial—that discharges at the end of the vehicle, and an intermediary

device which is drawn on the ground in the rear of the vehicle, as a discharge gate or end gate, which controls the discharge, and that fixes the level of the layer discharged from the material."

The supports of the hopper-shaped device of the Schellenger patent are materially different from those of the Myers patent; there is no roller in the Schellenger patent corresponding to the roller of the Foster patent; neither is there any stepping arrangement corresponding to that of the Fike patent, nor gates at the end of the hopperlike casing that controls or regulates the lateral discharge of material at the ends of the casing.

It is true that Schellenger in his specification states: While I have illustrated my distributer as used with a wagon having a discharge opening disposed about midway of the wagon body, it will be obvious that the distributer might be used with a wagon discharging, in any other manner, as, for instance, from the rear; it only being necessary that the distributer shall be disposed immediately beneath the discharge opening of the wagon, so that the load as it is discharged from the wagon body will pass into the discharging hopper and by said hopper be distributed properly and to an even depth along the roadbed. * * * Neither do I wish to limit myself to any particular form of dumping wagon and gate therefor, as it is obvious that other forms of dumping vehicle than that shown, provided with other forms of discharge gate, might be used without departing from the spirit of the invention."

It is, however, significant that he fails to amplify his statement by indicating what he had in mind, or to indicate in his drawings definitely the character of the machine or combination he had in mind, for distributing the road material upon the roadway, or its workings. Manifestly such 'a statement is entirely too general and indefinite.

These suggestions of what might be done do not carry conviction. "The claims of his patent limit his exclusive privileges, and his specifications may be referred to, to explain and to restrict, but never to expand, them." Stirrat v. Excelsior Manuf'g Co. (C. C. A.) 61 F. 980, 984. We do not think his claims warrant a construction broad enough to cover or anticipate the three patents in suit.

We have given due and careful consideration to the other patents cited as showing prior publication and anticipation, and arrived at the conclusion that the appellee's structure was not anticipated by the prior art, that the combination involved invention, and that it was a step forward in the art. The evidence shows that prior to the year 1917 there was nothing known to the art which would perform the functions of the Burch spreader. Even if all the elements of the combination had been used before, and the functions of each were well known to the art, we think they have never been combined for effectuating the purpose accomplished by appellee.

We quote and adopt the testimony of one of the witnesses who testified in the case as correctly stating the points of similarity between the machine of the three patents in suit and the machine manufactured by the defendants:

"(1) All of these machines are constructed for use at the rear end of a dumping truck, and all may, with equal facility, be attached to and detached from the dumping truck. An important advantage of having the machine as an attachment to the dumping truck is that the dumping truck does not have to be specially provided for use with a spreader, but may be put to any of the uses to which such a truck is put, so that, for example, on a road-building job a truck which could be used for hauling dirt or other material to or from the job could be utilized with one of the spreaders.

"(2) All of the machines have the general connection between the spreader and the truck, which is at once an exceedingly simple device for the purpose, and one which involves very little labor in attaching the spreader to the truck and detaching it from it.

"(3) All of the machines have a hopper-shaped casing that is freely open at the top and has a rear wall and a front wall, which inclines downwardly and rearwardly, and terminates at an outlet opening at the bottom of the casing, and in all of them the gravity or weight of the material dropped from the truck into the casing is utilized to cause this passage through the casing and its delivery to the subgrade of the surface to be covered.

"(4) All of the machines have a vertically adjusted gate on the back wall that compels the material issuing from the machine to have a certain level, and thus assures uniform or practically uniform depth of road material delivered from the machine.

"(5) All of the machines have two widely separated ground-engaging supports, that bring the center of gravity of the machine within its base for support, and thus assure that the leveling gate or gauge at the back wall shall not be lowered by any sinking of the rear part of the machine, which would result in lessening the vertical thickness or

depth of the course of material below the requirements of the road specifications.

"(6) In the case of all of the machines, the forward ground-engaging and supporting member consists of a rotating or rolling device, such as a wheel or a roller or cylinder.

"(7) Considering particularly the machine of the Foster patent and defendants' machine, the weight of material falling from the truck into the hopper-shaped casing is utilized to press the forward, road-smoothing roller against the surface to be smoothed, and so facilitate or promote the smoothing action of that forward roller.

"(8) In both defendants' and Foster's machines, the front roller is a permanently associated element in the machine, so that the roller, having performed its function of smoothing the surface, prepares the surface for the reception of the road material, and nothing intervenes between that roller and the point of discharge of the material to the road surface which would disturb or furrow up the surface after it has been smoothed by this smoothing roller.

"(9) In both the machine of the Foster patent and the defendants' machine, the long front roller is of special advantage in sandy or soft soil, because it affords a more extended support and insures the elimination of the likelihood of any sinking or depression of the machine into the soil, which would change the level of the material leveling gate at the rear of the machine.

"(10) In both the machine of the Fike patent and defendants' machine, there is a construction by which there can be an overhang of an already laid course at the margin, to assure the delivery of stone or road material at the junction point between the two courses, and thus result in uniformity of thickness or depth of the course at that point.

"(11) In both the Fike and the defendants' machines, there are the vertically adjustable gates at the two ends of the machine, which control the discharge of material at the end of the machine, so as to enable the delivery of the material laterally of the machine, close to the curb, or to the outer edge of a course already spread upon the road, and that avoids the necessity of employing hand labor to fill up gaps or spaces which might otherwise exist."

The patents in suit, in our opinion, do not describe a structure or machine operating in the same way as those described in the prior art, nor do they accomplish the same purpose by substantially the same means.

We think the inventions of these patents are incorporated in the appellant's and appellee's machines, as they are now constructed. While in the Butler machine the appellants do not use precisely all of the parts of the Burch machine, they do use mechanical equivalents for the absent parts, and the result is substantially the same.

Unquestionably there is some difference in the structure of the machines, but we think there is no difference in principle. We look more to the substance of things than their forms.

"Where a combination patent marks a distinct advance in the art to which it relates, as does the appellant's invention here, the term 'mechanical equivalent' should have a reasonably broad and generous interpretation, and protection against the use of mechanical equivalents in a combination patent is governed by the same rules as patents for other inventions. Imhaeuser v. Buerk, 101 U. S. 647, 25 L. Ed. 945. The fact, if it be a fact, that the infringing machine is superior, more useful, and more acceptable to the public than that of the appellant, does not avoid infringement, so long as the essential features of the appellant's patented machine are used, unless its superiority is due to a difference in function or mode of operation or some essential change in character. Morley Machine Co. v. Lancaster, 129 U. S. 263, 9 S. Ct. 299, 32 L. Ed. 715; Hoyt v. Horne, 145 U. S. 302, 12 S. Ct. 922, 36 L. Ed. 713; Lourie Implement Co. v. Lenhart, 130 F. 122, 64 C. C. A. 456; Diamond Match Co. v. Ruby Match Co. (C. C.) 127 F. 341; Whitely v. Fadner (C. C.) 73 F. 486." Smith Cannery Machines Co. v. Seattle-Astoria I. W. (C. C. A.) 261 F. 85, 88.

"Defendants therefore cannot escape infringement by adding to or taking from the patented device by changing its form, or even by making it somewhat more or less efficient, while they retain its principle and mode of operation and attain its results by the use of the same or equivalent mechanical means. Lourie v. Lenhart, 130 F. 122, 64 C. C. A. 456; [Leston] Letson v. Alaska Packers' Association, 130 F. 129, 64 C. C. A. 463; Eck v. Kutz (C. C.) 132 F. 758. By varying the encircling means, but producing the same results in substantially the same manner, there is infringement. Both physical and mechanical encircling, with centering, are found in defendants' machine. Union Paper Bag Machine Co. v. Murphy, 97 U. S. 120, 24 L. Ed. 935; Kinloch Telephone Co. v. Western Electric Co., 113 F. 659, 51 C. C. A. [369] 362; Auto Pneumatic Action Co. v. Kindler & Collins [(C. C. A.) 247 F. 323], supra; Pangborn Corporation v. Sly Mfg. Co. (C.

C. A.) 284 F. 217." *Angelus Sanitary Can Mach. Co. v. Wilson* (C. C. A.) 7 F.(2d) 314, 318.

We think the construction and mode of operation of the two machines are so similar that the Butler machine cannot be regarded as an independent invention.

Appellee's title to the three patents in suit, and its right to the exclusive use of the invention, is clear, and there is no room for reasonable doubt as to the infringement.

All of the assignments of error not herein referred to have been carefully considered. We find no error in the record, and the decree of the lower court is affirmed, with costs.

## APPENDIX 1.

### Butler Patent, No. 1,581,784.

"1. An apparatus for spreading hot materials, comprising a receiver for the materials, having a rearwardly inclining bottom and a rear wall at an angle to the vertical, the bottom of said rear wall spaced from the bottom of said receiver to provide a discharge throat, means movable on said rear wall to control the transverse area of said throat, and rollers arranged in pairs supporting said receiver above the surface operated over.

"2. An apparatus for spreading hot materials, comprising a receiver for the materials, having a rearwardly inclining bottom and a rear wall spaced from said bottom, and providing a throat for the discharge of the material, means on and movable relative to said rear wall to control the transverse area of said throat, means on and movable relative to the side walls and said throat to control the width of said throat, strike-off means for the material, said means laterally movable relative to said first named means, and rolling means supporting said receiver above and free of the ground.

"3. An apparatus for spreading hot materials, comprising a receiver having a rearwardly inclining bottom, and a rear wall spaced from said bottom to provide a throat, means movable on said rear wall to control the transverse area of said throat, roller means supporting said receiver above the ground and disposed free of the throat in said receiver, strike-off means on and movable with and laterally to said control means, and means to control the movement of said strike-off means.

"4. An apparatus for spreading hot materials, comprising a receiver, having an inclined bottom and an inclined rear wall spaced from said bottom to provide a throat for the material, roller means supporting said casing entirely above and free of the ground and disposed forward of the throat in said receiver, a blade on said rear wall, movable relative thereto and to the throat, to control the transverse area of said throat, means to operate said blade, partitions connected with said receiver and movable relative thereto and to said throat, to control the width of the throat, a strike-off plate on and movable with and relative to said blade, and means to operate said strike-off plate.

"5. An apparatus for spreading road materials, comprising a receiver for the material having a discharge throat in the rear thereof, a means to regulate the transverse area of said throat, to control the depth of material laid, adjustable means within said receiver to regulate the width of the throat, to control the width of the material laid, and means to lock said adjustable means in position of adjustment.

"6. An apparatus for spreading road materials, comprising a receiver for the materials having a discharge throat in the rear thereof, a blade movable on said receiver to control the transverse area of said throat, means to operate said blade, and means on said blade, forming extensions of same, to control the deposit of the material beyond the normal limits of the apparatus, and comprising plates having wings forming end walls for the throat, and means to operate said plates relative to said blade.

"7. An apparatus for spreading hot road materials, comprising a receiver having a rear discharge throat, roller means supporting said receiver entirely above the ground, a blade to control the transverse area of the throat, to regulate the depth of the material laid, plates on said blade, forming extensions thereof, to control the deposit of the material beyond the normal limits of the apparatus, means to agitate said material, and means to heat said agitating means.

"8. An apparatus for spreading hot road materials, comprising a receiver having a rear discharge throat, roller means supporting said receiver entirely above the ground, a blade to control the transverse area of the throat, to regulate the depth of the material laid, means to operate said blade, plates on said blade forming extensions thereof, to control the deposit of material beyond the normal limits of the apparatus, means to operate said plates relative to said blade, and a platform on said apparatus and extending longitudinally of the same and above the surface of the material laid.

"9. An apparatus for spreading hot materials, comprising a receiver for the materi-

als, having a rearwardly inclining bottom and a rear wall at an angle to the vertical, the bottom of said rear wall spaced from the bottom of said receiver to provide a discharge throat, means on and movable relative to said rear wall, to control the transverse area of said throat, and selective means to control the deposit of material through said throat beyond the sides of the apparatus.

"10. An apparatus for spreading hot materials, comprising a receiver for the materials having a rearwardly inclining bottom and a rear wall spaced from the bottom of said receiver to provide a discharge throat, and means to heat the material in said receiver.

"11. An apparatus for spreading hot materials, comprising a receiver for the materials, having a rearwardly inclining bottom and a rear wall spaced from said bottom and providing a throat for the discharge of the material, means on and movable relative to said rear wall to control the transverse area of said throat, and means movable relative to the side walls and said throat to control the width of said throat.

"12. An apparatus for spreading hot ma-

## DRAWINGS.

terials, comprising a receiver having a rearwardly inclining bottom, and a rear wall spaced from said bottom to provide a throat, means movable on said rear wall to control the transverse area of said throat, means movable relative to the side walls to control the width of the throat, roller means supporting said receiver above the ground and disposed free of the throat in said receiver, and strike-off means on and movable with and laterally to said control means.

"13. An apparatus for spreading hot materials, comprising a receiver having a rearwardly inclining bottom, and a rear wall spaced from said bottom to provide a throat, means movable on said rear wall to control the transverse area of said throat, means movable relative to the side walls to control the width of the throat, roller means supporting said receiver above the ground and disposed free of the throat in said receiver, and strike-off means on said control means.

"14. An apparatus for spreading road materials, comprising a receiver for the material having a discharge throat in the rear thereof, a means to regulate the transverse area of said throat to control the depth of material laid, and means within said receiver to regulate the width of the throat to control the width of the material laid, and means to control the deposit of material through said throat beyond the sides of the apparatus.

"15. An apparatus for spreading road materials, comprising a receiver for the material having a discharge throat in the rear thereof, means to regulate the transverse area of the throat to control the depth of material laid, means to regulate the longitudinal area of the throat to control the width of the material laid, roller means supporting the receiver above the ground, and means laterally movable relative to the receiver to strike off deposited material.

"16. An apparatus for spreading hot materials, comprising a receiver having a discharge throat in the rear thereof, a blade to regulate the transverse area of said throat to control the depth of material laid, roller means supporting said receiver above the ground and free of the throat therein, and means on and laterally movable relatively to said blades to strike off deposited material.

"17. An apparatus for spreading hot materials, comprising a receiver having a discharge throat in the rear thereof, a means to regulate the transverse area of said throat to control the depth of material laid, roller means supporting said· receiver entirely above the surface operated over, means to heat the material, and a platform longitudinally of said receiver and above the surface of the material laid.

"18. An apparatus for spreading hot materials, comprising a receiver having a discharge opening therein, a means to regulate the transverse area of said opening to control the depth of material laid, and means on said receiver to strike off deposited material.

"19. An apparatus for spreading road materials, comprising a receiver having a discharge opening therein, a means to regulate the transverse area of said opening to control the depth of material laid, and a platform longitudinally of the receiver and above the surface of the material laid.

"20. An apparatus for spreading hot materials, comprising a receiver having a discharge opening therein, a means to regulate the transverse area of said opening to control the depth of material laid, roller means supporting said receiver above the ground and free of the opening therein, and a platform longitudinally of the receiver and above the surface of the material laid."

## APPENDIX 2.

### Butler Patent, No. 1,605,094.

"1. In an apparatus for laying material, a casing having a rearwardly inclining bottom terminating in a downwardly extending apron, and a rear wall, a blade on said rear wall co-operating with said apron to form a chute having open sides, means to move said blade relative to said apron to control the transverse area of said chute, and roller means arranged in pairs and disposed in advance of the chute for supporting said casing entirely above the surface of the ground.

"2. In an apparatus for laying material, a casing having a rearwardly inclining bottom formed with an apron extending below said bottom, and a rear wall, a blade on said rear wall co-operating with said apron to form an open-sided chute below said bottom means to move said blade relative to said apron to control the transverse area of said chute, and means selectively operable to control the discharge of material through the sides of said chute.

"3. In an apparatus for laying material, a casing having a rearwardly inclining bottom formed with a downwardly extending apron, and a rear wall, a blade on said rear wall forming with said apron an open-sided chute below said casing, means to move said blade relative to said apron to control the transverse area of said chute, and means to control the passage of material through the

## DRAWINGS.

sides of said chute, said means movable with and independently of said blade.

"4. In an apparatus for laying material, casing rollers arranged in pairs to support the casing entirely above the surface operated over, said casing having an inclined bottom terminating below said casing, and a rear wall spaced from said bottom, a blade on said rear wall co-operating with the portion of the bottom terminating below the casing to form an open-sided chute, means to operate said blade on said rear wall to control the transverse area of said chute and means operable relative to the open sides of the chute to control the passage of material therethrough.

"5. In an apparatus for laying material, a casing having a rearwardly inclining bottom formed with an apron extending below said casing, and a rear wall spaced from said bottom, a blade on said rear wall co-operating with said apron to form an open-sided chute below said casing, means for selectively moving said blade to control the quantity of material passing through said chute, and means for selectively controlling the quantity of material passing through the sides of said chute."