# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 1, 2025          Decided July 11, 2025

No. 24-5072

NATIONAL COUNCIL OF AGRICULTURAL EMPLOYERS,
APPELLANT

v.

UNITED STATES DEPARTMENT OF LABOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-03569)

*David R. Dorey* argued the cause and filed the briefs for appellant.

*Daniel Winik*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, at the time the brief was filed, and *Charles W. Scarborough*, Attorney.

Before: KATSAS and CHILDS, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: This case presents a recurring question of administrative law: At what point does a substantive rule submitted by an agency to the Office of the Federal Register (OFR) for publication become final so that it cannot be withdrawn or amended without going through the notice-and-comment requirements of the Administrative Procedure Act? The answer to this question is particularly significant during transitions between one presidential administration and the next. Those periods are often marked by a flurry of rulemaking activity. Agency leaders of the departing administration work furiously to finalize and publish new regulations, then newly appointed leaders act expeditiously to withdraw unpublished rules that might be inconsistent with the new administration's priorities, while through it all the OFR beavers away trying to keep up with the changes.

Ambiguity regarding the legal significance of processing by the OFR can result in regulatory uncertainty that persists well past the presidential transition period, as this case illustrates. In 2019 the Department of Labor (DoL) issued a notice of proposed rulemaking (NPRM) to amend its 2010 regulations regarding a visa program. During the last days of the Trump Administration in 2021, the DoL announced to the public and submitted to the OFR for publication in the Federal Register what it characterized as a final rule. While the OFR was processing the rule, however, the DoL under President Biden withdrew it. Then, in 2022, the DoL issued a new rule based upon the 2019 NPRM.

The question here is which rule marked the culmination of the rulemaking process that began in 2019, the 2021 Trump rule or the 2022 Biden rule? Or, more generally, at what point does a substantive rule submitted to the OFR for publication become final so that a new round of notice and comment is required before the agency can change or withdraw the rule?

In this case, we hold the rulemaking process culminated in the 2022 Rule. A substantive rule is not ordinarily final until the OFR makes it available for public inspection. At that juncture the rule is "duly fixed," *GPA Midstream Ass'n v. Dep't of Transp.*, 67 F.4th 1188, 1195 (D.C. Cir. 2023), and "becomes 'valid' against the public at large," *Humane Soc'y v. USDA*, 41 F.4th 564, 570 (D.C. Cir. 2022) (quoting 44 U.S.C. § 1507). Although an agency can "for good cause," 5 U.S.C. § 553(d)(3), make a rule final without processing by the OFR — by putting it into effect expeditiously and giving actual notice of the official rule to members of the public — the DoL did not do so here. Instead, the DoL made the 2021 Rule contingent upon processing by the OFR and then withdrew the rule before it became final.

## I. Background

### A. Statutes and Regulations

This case involves the interplay among three statutes: The APA, the Freedom of Information Act (FOIA), and the Federal Register Act (FRA). As explained in more detail below, the APA sets out the requirements for rulemaking, *id.* § 553; the FOIA requires federal agencies to publish substantive rules in the Federal Register, *id.* § 552(a)(1); and the FRA prescribes the publication process, 44 U.S.C. §§ 1501–11.

The APA defines a rule, in relevant part, as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). Rulemaking is the "agency process for formulating, amending, or repealing a rule." *Id.* § 551(5). The rulemaking process begins when an agency provides an NPRM and solicits public comments about the proposal. *See id.* §§ 553(b)–(c) (setting forth the general

notice-and-comment requirement and excluding certain species of rules from that requirement).

More specifically, an agency must publish a "[g]eneral notice" of proposed rulemaking in the Federal Register "unless persons subject thereto are named and either personally served or otherwise have actual notice thereof." *Id.* § 553(b). Then the agency is required to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c). The FOIA instructs agencies to "publish in the Federal Register . . . substantive rules of general applicability adopted as authorized by law." *Id.* § 552(a)(1)(D). It also describes the consequence of an agency's failure to publish a rule in the Register: "[A] person may not in any manner . . . be adversely affected by a matter required to be published in the Federal Register and not so published," except to the extent the "person has actual and timely notice of the terms thereof." *Id*. § 552(a)(1) (cleaned up). The APA further provides that "[t]he required publication . . . of a [final] substantive rule shall be made not less than 30 days before its effective date," subject to certain exceptions not here relevant. *Id.* § 553(d).

The FRA likewise requires rules to be published in the Federal Register and describes a similar consequence for unpublished rules that are not available for public inspection. In particular, it provides that three categories of documents must be published in the Federal Register: (1) certain presidential proclamations and executive orders, (2) "documents or classes of documents that the President may determine from time to time have general applicability and legal effect," and (3) "documents or classes of documents that may be required so to be published by Act of Congress." 44 U.S.C. § 1505(a). The FRA defines "document" to include a "regulation" or

"rule" that has been "issued, prescribed, or promulgated by a Federal agency." *Id.* § 1501.

The FRA prescribes in detail the process that culminates in the publication of a document. For present purposes, the key step in that process is the OFR's making the document available for public inspection. *See id.* § 1503. As we explained in *Humane Society*, public inspection puts the public on constructive notice of the document. 41 F.4th at 570. "That is the 'day and hour' the [FRA] requires be noted for posterity," *id.* (quoting 44 U.S.C. § 1503), for at that moment the document "becomes 'valid' against the public at large," *id.* (quoting 44 U.S.C. § 1507). Conversely, a document required by the FRA to be published in the Federal Register "is not valid as against a person who has not had actual knowledge of it until the document has been filed with [the OFR] and a copy made available for public inspection." 44 U.S.C. § 1507. "[W]hen withdrawing a rule that has been filed for public inspection but not yet published in the Federal Register," the agency must "provide notice and an opportunity for comment." *Humane Soc'y*, 41 F.4th at 565; *see, e.g.*, Licensing of Designated Qualified Persons and Other Amendments Withdrawal, 88 Fed. Reg. 74336, 74341/2 (2023) (withdrawing the rule at issue in *Humane Society* after providing notice to the public and an opportunity to comment upon the withdrawal).

The FRA also established the Administrative Committee of the Federal Register and charged it with writing regulations governing the "manner and form in which agencies submit documents for publication in the Federal Register." 44 U.S.C. § 1506(a)(3). The Committee has promulgated detailed regulations prescribing how the OFR "receives documents" and pursuant to which "each document shall be held for confidential processing until it is filed [by the OFR] for public inspection." 1 C.F.R. § 17.1. During this confidential

processing period, the OFR reviews the document for compliance with its regulations, works with the submitting agency to resolve problems, and reserves the right to return to the agency any document that "does not meet the minimum requirements of [the OFR's regulations]." 1 C.F.R. § 2.4(b); *see Kennecott Utah Copper Corp. v. DOI*, 88 F.3d 1191, 1205 (D.C. Cir. 1996) (explaining the OFR "reviews and edits documents" prior to filing them for public inspection); *Agency FAQs for OFR*, Nat'l Archives (2024), https://perma.cc/9NTX-KLTF (hereinafter *OFR FAQs*) (explaining the processing time for a document depends upon "the number and scale of edits needed" and "the time it takes to work with your agency to resolve the edits"). Notwithstanding the FRA's requirement that, upon filing, a document be made "immediately available for public inspection," 44 U.S.C. § 1503, we have upheld as reasonable the OFR's regulations providing for this processing period. *Kennecott*, 88 F.3d at 1206 (applying the now-abrogated *Chevron* doctrine).

The OFR's regulations further authorize the Director of the OFR to provide agencies with "instructions" to facilitate compliance with the statutory and regulatory scheme. 1 C.F.R. § 15.10. The OFR has accordingly provided agencies with comprehensive guidance for drafting documents. OFR, Nat'l Archives and Recs. Admin., Document Drafting Handbook i (Aug. 2018 ed., rev. Oct. 2023), https://perma.cc/W694-DYBF (hereinafter Handbook).[1] Pursuant to the OFR's regulations and guidance, an agency may correct or withdraw a document prior to its publication. 1 C.F.R. § 18.13; Handbook §§ 5.1–5.3.

---

[1] The parties cite different versions of the handbook, and a new version was released effective June 2025. The relevant aspects of the OFR's processes are not, however, in dispute, and the versions do not materially differ for present purposes.

The process for an agency to correct a rule that has been submitted to the OFR depends upon whether the OFR has filed the document on its public inspection docket. *See Public Inspection*, Federal Register, https://www.federalregister.gov/public-inspection/current (last visited June 28, 2025). An agency can ask the OFR to make "minor corrections" to a document that the OFR has not yet filed for public inspection, which the OFR will implement directly "as time and resources permit." Handbook § 5.2. The OFR can similarly correct a "substantive error . . . during the review process." *Id.* Still, extensive changes are "difficult [for the OFR] to make once [it has] assigned a publication date," *id.*, which it does prior to filing a document for public inspection, 1 C.F.R. § 17.2(a). *See* Handbook § 8.8 ("The OFR assigns a publication date once a document meets [the OFR's] publication requirements"). After the OFR places a document on the public inspection docket, an agency can still ask the OFR to make corrections. *Id.* § 5.2. If the OFR does so, however, it will "re-post [the] document on public inspection [to the docket] with an editorial note." *Id.*

As for withdrawing a document submitted to the OFR for publication, the OFR's guidance draws a similar distinction between documents already filed and documents not yet filed on the public inspection docket. If an agency withdraws a document before the OFR has put it on the docket, then the OFR simply makes the physical copy of the rule "available [to the agency] for pick-up." *Id.* § 5.3; *see Kennecott*, 88 F.3d at 1205–06 (explaining an agency may withdraw a rule during the OFR's confidential processing period). If, however, an agency withdraws a document that the OFR has put on the inspection docket, which it does "on the business day before the date of publication," then the OFR "will replace [the agency's] document with a document stating the fact of the withdrawal." Handbook §§ 5.3, 8.5. "That document remains on public inspection through the date it was originally scheduled to

publish," and it "becomes [the OFR's] record" and is therefore not returned to the agency. *Id.* § 5.3; *see, e.g*, *Public Inspection Issue*, Federal Register (Jan. 26, 2021), https://perma.cc/K62A-5X8P (explaining the FDA "withdrew this [rule] while it was on public inspection" and a "copy of the [FDA's] withdrawal request is available at the [OFR]," while replacing the copy of the rule on public inspection with a new document stating "THIS DOCUMENT WAS WITHDRAWN").

The OFR may process a document under its "regular," "emergency," or "deferred" schedules. 1 C.F.R. §§ 17.1–7. Under the regular schedule, which applies by default, a "document received [by the OFR] shall be filed for public inspection only after it has been received, processed and assigned a publication date." *Id.* § 17.2(a). An agency can request that the OFR assign a document to its emergency schedule, which "provides for the fastest possible public access to a document." *Id.* § 17.5. To do so, the agency must submit a letter to the OFR "describ[ing] the emergency and the benefits to be attributed to immediate public access." *Id.* § 17.6(a). If the Director approves the request, then the document "shall be filed [for public inspection] as soon as possible following processing and scheduling." *Id.* § 17.6(c). The OFR can also assign a document to a deferred schedule when the submitting agency so requests or the document requires extra processing time (e.g., due to length). *Id.* § 17.7(a).

## B. The 2021 and 2022 Rules

As explained in detail below, and as depicted in the following figure, the DoL began a rulemaking in 2019 to revise a nonimmigrant visa program and submitted a "final rule" to the OFR for publication in 2021. Because the DoL withdrew the 2021 Rule during the OFR's confidential processing period, and in 2022 submitted a new "final rule," only the latter rule

was filed on the public inspection docket and thereafter published in the Federal Register.

## Rulemaking Timeline



In 2019 the DoL issued a proposed rule to amend its 2010 regulations implementing the H-2A visa program, which allows employers temporarily to employ foreigners for agricultural work. Temporary Agricultural Employment of H-2A Nonimmigrants in the United States, 84 Fed. Reg. 36168, 36168/3 (proposed July 26, 2019) (to be codified at 20 C.F.R. pts. 653 and 655). The DoL received more than 83,000 comments, including one from the petitioner, National Council of Agricultural Employers (NCAE).

On January 11, 2021, nine days before Joe Biden became president, the DoL transmitted what it characterized as its final rule to the OFR for publication. The DoL requested "emergency publication" and asked that the "rule be made available for immediate filing [for public inspection] on January 14, 2021, with an emergency publication [in the Federal Register] on January 15, 2021." On January 14 the DoL asked the OFR for a status update and requested that the rule be published on or before January 19. The OFR responded the same day and explained that it could not publish the rule by January 19 given the "relentless backlog of regulatory documents" that had been submitted to the agency in the days leading up to the presidential transition.

On January 15, the DoL posted a press release to its website in which it "announced a final rule that modernizes the H-2A Temporary Agricultural Labor Certification Program." The agency also held a telephonic "stakeholder briefing" regarding what it characterized as a "significant rulemaking on the H-2A Visa Program." The press release included a link to the rule and said that the DoL was "issuing this final rule in response to the extensive public comments received." It explained the DoL would "publish the final rule in the Federal Register at a later date" and invited the public to "[r]ead the final rule." Each page of the posted rule included the following disclaimer:

> This regulation has been submitted to the Office of the Federal Register (OFR) for publication, and is currently pending placement on public inspection at the OFR and publication in the Federal Register. This version of the regulation may vary slightly from the published document if minor technical or formatting changes are made during the OFR review process. Only the version published in the Federal Register is the official regulation.

The "date" field of the rule read: "This final rule is effective," after which the DoL entered in brackets "30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER."

That same day, the President and CEO of the NCAE forwarded to his attorney an email from an executive at another trade association, saying "the long-expected H-2A program rule is queued up for publication in the Federal Register." The author of the email explained the rule had a "30-day effective date" and was "[l]ikely to be caught up in the incoming administration's 60-day regulatory freeze," and he deemed it

"[h]ighly questionable" whether the rule would ever come into force.

On January 20, President Biden was sworn into office and the DoL promptly withdrew the rule, which was still in the OFR's processing period. Nearly two years later, the DoL published another rule in the Federal Register based upon the 2019 notice-and-comment procedure. *See* Temporary Agricultural Employment of H-2A Nonimmigrants in the United States, 87 Fed. Reg. 61660, 61664/1-3 (2022). It is undisputed that both the 2021 and the 2022 rules were logical outgrowths of the 2019 proposed rule. *See Earthworks v. DOI*, 105 F.4th 449, 461 (D.C. Cir. 2024) ("Under the APA, an agency must provide an opportunity for notice and comment if a final rule is not a 'logical outgrowth' of a proposed rule, because in that case notice of the proposed rule will have given the public no occasion to comment on what emerged as the final rule").

## C.  Procedural History

The NCAE challenged the withdrawal of the 2021 Rule and promulgation of the 2022 Rule arguing, among other things, that the 2021 Rule was "duly issued" and thereafter "unlawfully repealed." It also asked the district court preliminarily to enjoin the 2022 Rule.

As an initial matter, the court concluded that the NCAE lacked standing to challenge the withdrawal of the 2021 Rule, which had imposed increased surety bond requirements upon the NCAE's members, because avoiding the increase made its members better off. The court then determined the NCAE had standing to challenge the validity of the 2022 Rule, at least with respect to its surety bond provisions, but denied the NCAE's request for a preliminary injunction.

The district court later granted the DoL's cross-motion for summary judgment. The court explained that the NCAE's claim regarding the validity of the 2022 Rule turned upon whether the 2021 Rule represented "the culmination of the rulemaking process." It then determined that because the "OFR [had] never made the 2021 Rule available for public inspection" before the DoL withdrew it, the rule had not become final. The NCAE now appeals the district court's decision solely with regard to the validity of the 2022 Rule.

## II. Discussion

We begin by considering whether we have jurisdiction to hear this case consistent with Article III of the Constitution of the United States and then proceed to the merits. The issues being purely legal, we review them de novo. *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323 (D.C. Cir. 2013) (standing); *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 506 (D.C. Cir. 2016) (summary judgment).

### A. Standing

The DoL does not dispute that the NCAE has standing to challenge at least the surety bond requirements of the 2022 Rule. We have an independent duty, however, to assure ourselves that this case satisfies the requirements of Article III. *TikTok Inc. v. Garland*, 122 F.4th 930, 947 (D.C. Cir. 2024).

To establish its standing, a plaintiff must show it "has suffered a personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Chenoweth v. Clinton*, 181 F.3d 112, 113 (D.C. Cir. 1999) (cleaned up). As an association, the NCAE must establish that "(1) at least one of its members would have standing to sue in [its] own right, (2) the interests the association seeks to protect are germane to its purpose, and

(3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002). Here the NCAE advances a procedural theory of injury — that it was deprived "of its bedrock procedural right [under the APA] to comment" on the 2022 Rule. "When plaintiffs challenge an action taken without required procedural safeguards, they must establish the agency action threatens their concrete interest." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). That is, the NCAE must demonstrate that its members have more than "a mere general interest in the alleged procedural violation common to all members of the public." *Id.* (quotation omitted). It must show that their concrete interest was "adversely affected by the procedural deprivation." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013).

If the plaintiff can make this threshold showing, then we relax "the normal standards for immediacy and redressability," *Mendoza*, 754 F.3d at 1010, but still require it to "show that the agency action was the cause of some redressable injury to the plaintiff," *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1279 (D.C. Cir. 2007). In short, if the NCAE "can demonstrate a causal relationship between the final agency action and the alleged injuries [to its members], [then we] will assume the causal relationship between the procedural defect and the final agency action." *Mendoza*, 754 F.3d at 1010 (cleaned up).

Here the concrete interest of the NCAE's members in the 2022 Rule is readily apparent. The NCAE represents approximately 80% of U.S. farm and ranch employers, as well as roughly 85% of the farm and ranch families who use the H-2A visa program. Its representation focuses "exclusively on agricultural labor issues from the employer's viewpoint, to include the H-2A [p]rogram." The 2022 Rule, for its part,

imposes requirements upon agricultural employers who participate in the H-2A program. As the preamble to the 2022 Rule put it: The "issues addressed" by the rule include modifications to the "standards and conditions of employment that employers must offer to workers." 87 Fed. Reg. at 61660/1. Moreover, as the district court explained, the NCAE submitted declarations quantifying the increased financial costs of surety bonds, as compared with the status quo (i.e., the 2010 Rule), that the 2022 Rule imposed upon specific NCAE members.

Our conclusion is no different even if we evaluate the NCAE's injury relative to the 2021 Rule rather than to the 2010 Rule. Although both the 2021 and 2022 rules increased the surety bond requirements for employers as compared to the 2010 Rule, the 2021 Rule alone reduced the surety bond requirement for businesses seeking to hire fewer than ten H-2A workers. And there were other aspects of the 2022 Rule the NCAE argued before the district court further disfavored its members relative to the 2021 Rule. *See, e.g.*, Mem. in Opp'n to Defs.' Cross-Mot. for Summ. J. at 5–6, No. 1:22-cv-03569 (D.D.C. Sept. 14, 2023), ECF No. 31. We therefore conclude that the NCAE sufficiently demonstrated that one or more of its members would have standing to bring this case.

We likewise conclude that, in challenging the 2022 Rule, the NCAE seeks to protect interests that are germane to its purpose, and that an individual member of the NCAE need not participate in this case. *See GrassRoots Recycling Network, Inc. v. EPA*, 429 F.3d 1109, 1111 (D.C. Cir. 2005). Having assured ourselves that we have jurisdiction to hear this appeal, we turn to its merits.

**B. Merits**

The NCAE's sole argument is that the 2022 rule is invalid because the DoL issued it without first affording notice and an opportunity for public comment, in violation of the APA. The NCAE's theory is that the 2021 Rule "was finalized by [the DoL] via its own widespread publication at the end of the first Trump Administration," Reply Br. 1, so that it could not be withdrawn or replaced absent a new round of notice and comment.

As detailed below, the problem with the NCAE's argument is that the DoL withdrew the 2021 Rule while it was still in the OFR's processing period, before it was made available for public inspection. Although an agency can, in certain situations, make a rule effective prior to review by the OFR, *see* 5 U.S.C. § 553(d), the DoL did not do so here.

### 1. A Rulemaking Ordinarily Concludes with Public Inspection.

The NCAE's argument that the 2022 Rule required notice and comment depends upon whether the 2021 Rule became final during processing by the OFR. It did not.

Recall that a "rule" is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law." 5 U.S.C. § 551(4). In other words, it is "a statement prescribing law with future effect." *Humane Soc'y*, 41 F.4th at 569. A "final rule is prescribed when it is established authoritatively." *GPA Midstream*, 67 F.4th at 1195 (cleaned up); *see Prescribe*, Black's Law Dictionary (12th ed. 2024) ("To dictate, ordain, or direct; to establish authoritatively (as a rule or guideline)"). That occurs when the rule "is duly fixed and so becomes binding on the public, 'even if it sets a future effective date.'"

*GPA Midstream*, 67 F.4th at 1195 (quoting *Humane Soc'y*, 41 F.4th at 571). At that point, notice and comment are required to modify or repeal the rule. *Humane Soc'y*, 41 F.4th at 565.

Public inspection ordinarily denotes the time when a rule is authoritatively established. Prior to public inspection, a rule can be "withdrawn [by the agency] without explanation or notice," and a "rule that is unenforceable and may be withdrawn at will is not duly fixed." *GPA Midstream*, 67 F.4th at 1195 (cleaned up). Indeed, this court has repeatedly identified public inspection as the critical moment in the rulemaking process. *See, e.g.*, *Humane Soc'y*, 41 F.4th at 570 (describing public inspection as "the critical date" that marks the validity of a rule as to the general public); *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 953–54 & n.5 (2013) (concluding public inspection was the point at which the agency "had taken all the steps necessary to issue the rule" and therefore established "the time for testing [its] validity"); *GPA Midstream*, 67 F.4th at 1195 (holding public inspection marked the earliest possible date a rule was prescribed); *Liquid Energy Pipeline Ass'n v. FERC*, 109 F.4th 543, 548 (2024) (explaining "the APA generally requires the agency to afford notice-and-comment procedures before amending [a] rule" after it has become "'valid' against the public at large" (quoting *Humane Soc'y*, 41 F.4th at 570)).

To be sure, as we have said, an agency can make some rules effective prior to processing by the OFR, and hence prior to public inspection. *See Humane Soc'y*, 41 F.4th at 572 (explaining that there are situations in which a rule can "take effect immediately"). Specifically, the APA allows an agency to make a rule effective prior to publication — and therefore prior to processing by the OFR — for "good cause" and for interpretive and certain other types of rules. 5 U.S.C. § 553(d) (providing exceptions to the requirement that a rule be

published or served 30 days before its effective date); *Humane Soc'y*, 41 F.4th at 572–73 (making a similar observation); *id.* at 582 (Rao, J., dissenting) (explaining these exceptions "do not apply to the mine run of regulations"). In those situations, a rule that is unpublished (FOIA) or unavailable for public inspection (FRA) is nevertheless effective as against a person with "actual" knowledge of it. 44 U.S.C. § 1507 (FRA); 5 U.S.C. § 552(a) (FOIA); *see Humane Soc'y*, 41 F.4th at 570–71 (making a similar observation). That is, in the rare case that an agency finalizes and places a rule into effect to enforce it prior to publication, it has "established authoritatively" and "duly fixed" the rule. *See* 5 U.S.C. § 551(4) (defining "rule" to include "an agency statement" that "prescribe[s] law"); *Humane Soc'y*, 41 F.4th at 571 (rejecting the government's "claimed powers to enforce unpublished rules and to withdraw those rules without abiding the APA's procedural requirements").

For most rules, however, processing by the OFR is the final step in the rulemaking process before the rule is officially released to the public. During the processing period, the OFR reviews documents for compliance with its requirements, works with the submitting agency to resolve issues, and reserves the right not to publish a document that does not meet "minimum requirements." 1 C.F.R. § 2.4(b). In this way the OFR plays a critical role in finalizing regulations for official release. Indeed, as the DoL acknowledged in its public disclaimer regarding the 2021 Rule, "Only the version [of the rule] published in the Federal Register [after processing by the OFR] is the official regulation." Or as the DoL later described its submission of the 2021 Rule to the OFR, "On January 11, 2021, [the DoL] transmitted to the [OFR] a draft of an unpublished draft final rule." Temporary Agricultural Employment of H–2A Nonimmigrants Ratification, 90 Fed. Reg. 2610, 2610 n.1 (2025). The approach taken by the DoL

here is standard fare for rules subject to mandatory publication in the Federal Register. By sequencing official release in this way, an agency ensures that no conflict will arise between the final rule and an earlier version that predates OFR processing.

In fact, for many rules the effective date is itself determined by the OFR during processing. *Cf. Nat. Res. Def. Council, Inc. v. EPA*, 683 F.2d 752, 762 (3d Cir. 1982) (explaining the effective date "is an essential part of any rule"). That is because the OFR will "calculate and insert dates tied to *Federal Register* publication," Handbook § 2.4, and the OFR sets the date of publication during confidential processing, 1 C.F.R. § 17.2(a). For example, here the 2021 Rule was to become effective 30 days after publication — indicated by a placeholder for the OFR to update upon setting the publication date.

Although a placeholder can ensure a rule will be published at least 30 days before its effective date, as ordinarily required by the APA, *see* 5 U.S.C. § 553(d), doing so makes the effective date of the rule contingent upon how long the OFR takes to process it, *see OFR FAQs* (explaining the OFR processes documents "on a first-in, first-out system, as much as possible, but the time it takes to get to and process [an agency's] document depends on a number of factors"). The arguments in this case illustrate the situation.

The NCAE contends the DoL violated its own regulation by not filing the 2021 Rule for public inspection according to its regular schedule and therefore "acted arbitrarily and capriciously." *See* 1 C.F.R. §§ 17.2(b)–(c). According to the NCAE, "there would likely not be a dispute" had the DoL simply followed its regulations. The DoL counters that the regulations allow it to defer publication if "[t]here are technical problems, unusual or lengthy tables, or illustrations, or the

document is of such size as to require extraordinary processing time." *Id.* § 17.7(a); *see Kennecott*, 88 F.3d at 1205 (recognizing that the regulations contemplate the possibility of a delayed schedule when "a document is unusually long"). The DoL further observes that its drafting handbook informs agencies that "a document of 100 double-spaced pages or more requires additional time," Handbook § 8.8, and the 2021 Rule was 722 pages long. In other words, the OFR considers the 2021 Rule to be in the heartland of its discretion with respect to the timing of publication.

We do not resolve this dispute because the NCAE waived any challenge to the 2021 Rule. Reply Br. 3 (explaining that the NCAE challenges only "the procedural defects of the 2022 Final Rule").[2] For present purposes, the point is that prior to public inspection disagreements can arise during OFR processing that determine when — and sometimes whether — a rule will go into effect. *See* 1 C.F.R. § 2.4(b) (giving the Director of the OFR authority to return to the agency any document that "does not meet the minimum requirements of [the OFR's regulations]").

At bottom, public inspection marks the point at which all uncertainty regarding the substance of a rule evaporates. At that moment the OFR's review of the rule is complete and all concerns that arose in that review have been resolved with the agency; the rule has a set publication date; and a final version of the rule is posted to the public inspection docket and thereby becomes valid as to the public at large. We therefore hold that

---

[2] For the same reason, we do not address the NCAE's assertion that the OFR's confidential processing period is contrary to the provision in the FRA requiring that a document be made available for public inspection "immediately" upon filing. 44 U.S.C. § 1503.

public inspection presumptively marks the consummation of the rulemaking process.

### 2. The 2021 Rule Remained Unfixed and Non-Binding.

The NCAE argues that the DoL nevertheless fixed the 2021 Rule in place when it announced the rule and posted a copy on its website. This argument stumbles out of the gate because the posted rule was, on its face, subject to OFR processing. Not only did it include a placeholder for the effective date — to be set by the OFR — it also featured a prominent disclaimer notifying the public that the rule was unofficial. The disclaimer explained the rule might "vary slightly from the published document" and "[o]nly the version published in the Federal Register is the official regulation."

The NCAE understandably emphasizes that the disclaimer mentioned solely "minor technical or formatting changes." True enough. Even so, the agency did not disclaim its right to make more significant changes. As we explained in *Kennecott*, the OFR's regulations allow an agency "to correct mistakes and even to withdraw regulations until virtually the last minute before public release." 88 F.3d at 1206. Nothing in the disclaimer to the 2021 Rule suggested the DoL was foregoing its right to do so.

In fact, nothing about the disclaimer was unusual in any respect. The DoL and other agencies routinely use similar disclaimers when they post as yet unpublished rules to their websites.[3] These disclaimers make clear that the posted

---

[3] *See, e.g.*, DoL, Emp't and Training Admin., RIN 1205-AB89, Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in

document is unofficial, and that the official rule will be published later in the Federal Register. That the 2021 Rule contained a boilerplate disclaimer reinforces our view that it was non-final during confidential processing by the OFR. In sum, the DoL did nothing to differentiate this rule from the mine run of rules preliminarily posted by agencies, including the DoL itself — with no expectation of prepublication enforcement — pending official release by the OFR.

The NCAE invokes cases involving individuals with actual notice of unpublished rules to buttress its position that the 2021 Rule was final and enforceable. Each arose under circumstances quite different from this case, however, and they only underscore why the 2021 Rule was not final. For example, the cases affirming criminal convictions involved violations of unpublished regulations in effect at the time the offense was committed. *See United States v. Aarons*, 310 F.2d 341, 342–43 (2d Cir. 1962) (Coast Guard notice closing the Thames River to accommodate the launch of a "nuclear powered submarine"); *United States v. Ventura-Melendez*, 321 F.3d 230, 233 (1st Cir. 2003) (creating a "temporary security zone . . . adjacent to a bombing range at a military installation"); *United States v. Mowat*, 582 F.2d 1194, 1198, 1201–03 (9th Cir. 1978) (restricting entry to an island "used as a target area for bombing and gunnery practice" (cleaned up)); *United States*

the United States, https://perma.cc/RE9V-BBAB (same in related rule); HHS, Ctrs. for Medicare & Medicaid Servs., RIN 0938-AT65, Adoption of the Methodology for the HHS-operated Permanent Risk Adjustment Program under the Patient Protection and Affordable Care Act for the 2017 Benefit Year, https://perma.cc/R8E8-MX8Y (similar); Dep't of Treasury, Off. of Inv. Sec., RIN 1505-AC88, Definition of Military Installation and the List of Military Installations in the Regulations Pertaining to Certain Transactions by Foreign Persons Involving Real Estate in the United States, https://perma.cc/6YYX-TYVF (similar).

*v. Bowers*, 920 F.2d 220, 222–23 (4th Cir. 1990) (involving unpublished tax forms that were in use and "known to over two hundred million Americans"). These cases did not involve the finality of a rule pending before the OFR with an effective date conditioned upon publication. A similar point applies to the non-criminal case cited by the NCAE and discussed in *Humane Society*. *See Arlington Oil Mills, Inc. v. Knebel*, 543 F.2d 1092, 1098–99 (5th Cir. 1976) (involving announcement of an agricultural price support issued by the Department of Agriculture in March 1976 "for the 1976 crop year" that went unpublished in the Federal Register); *Humane Soc'y*, 41 F.4th at 574. There, members of the regulated public "made numerous inquiries as to the status of the [price support] announcement," and agency officials gave "repeated assurances that the . . . announcement would remain in force." *Arlington Oil Mills*, 543 F.2d at 1099. Here the 2021 Rule was never "in force" as to any person, with or without actual notice, nor could it have been until after OFR processing. For by its own terms the 2021 Rule would become effective only after publication in the Federal Register, and there was to be just one "official regulation" — "the version published in the Federal Register."

The other cases upon which the NCAE principally relies are likewise inapposite. Two involved the timeliness of a petition under statutory review provisions conditioning the availability of judicial review. *See Indus. Union Dep't v. Bingham*, 570 F.2d 965, 970–71 (D.C. Cir. 1977) (Leventhal, J., concurring) (judicial review provision of the Occupational Safety and Health Act); *Saturn Airways, Inc. v. Civ. Aeronautics Bd.,* 476 F.2d 907, 908–09 (D.C. Cir. 1973) (timeliness of challenge to regulations of the Civil Aeronautics Board). The third construed the word "promulgation" in a "record cut-off provision" of the Clean Air Act that promoted "effective judicial review." *Am. Petroleum Inst. v. Costle*, 609

F.2d 20, 22–24 (D.C. Cir. 1979). In *Humane Society*, however, we questioned the persuasive force of cases such as these, which deal with the meaning of terms "in particular statutory review provisions, a question unrelated to when notice-and-comment requirements attach." 41 F.4th at 574. *But see id.* at 578–79 (Rao, J., dissenting) (discussing cases that use publication in the Federal Register to mark the promulgation of a rule by an agency for purposes of judicial review).

To the extent cases analyzing the timeliness of a petition for review are relevant here, the most apposite authority favors using public inspection to denote finality. In *GPA Midstream* we considered the timeliness of a petition for review of safety standards. 67 F.4th at 1195. There, as here, our task was to determine when the rule was "prescribed." *See id.* (explaining the relevant judicial review provision required a petition be filed "not later than 89 days after the regulation is prescribed" (quoting 49 U.S.C. § 60119(a)(1)). There, as here, while the rule was being processed by the OFR the agency had posted on its website an unofficial version of the rule with the usual disclaimer. *See PHMSA Final Rule: Pipeline Valve Installation and Rupture Detection Standards — Federal Register Submission*, Dep't of Transp. (Mar. 31, 2022), https://perma.cc/KVU6-ED99?type=image. There, as here, the effective date of the rule was keyed to publication in the Federal Register. *See* Suppl. Br. of Pet'rs, *GPA Midstream, Ass'n v. Dep't of Transp.*, No. 22-1148, at B–2 (D.C. Cir. Feb. 21, 2023) (unofficial rule). Invoking *Humane Society*, we concluded public inspection marked the point at which the rule was officially "prescribed" (or "duly fixed") and therefore found the petition timely. 67 F.4th at 1195. In other words, we recognized that public inspection marked the earliest point at which the rule could be deemed final. *See id.* (explaining we had "no occasion to decide whether the filing clock started

running only after the rule was first published in the Federal Register").

At points in its briefs, the NCAE contends the 2021 Rule was final when announced because it satisfied the standard for "final agency action" in a judicial review provision of the APA. *See* 5 U.S.C. § 704. Two conditions "generally must be satisfied" under that standard: "First, the action must mark the consummation of the agency's decisionmaking process — it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

As the district court recognized, however, our decision in *Humane Society* did not rely upon § 704 to determine the finality of the rule at issue there. Instead, we held public inspection marked finality based upon an objective source — the text of the FRA. *Humane Soc'y*, 41 F.4th at 570 (explaining "the critical date" under the FRA is when "a rule is filed for public inspection . . . [and] becomes 'valid' against the public at large" (quoting 44 U.S.C. § 1507)). Finality for the purpose of judicial review, by contrast, entails a "pragmatic" and "flexible" inquiry that "lacks many self-implementing, bright-line rules" and "is hardly crisp." *Rhea Lana, Inc. v. DoL*, 824 F.3d 1023, 1027 (D.C. Cir. 2016) (cleaned up).

It bears particular emphasis that public inspection being the brightline marker of when a rule is authoritatively established comes with considerable practical advantages. It provides regulated entities with certainty, and it gives agencies a clear understanding of the procedural requirements they must satisfy under the APA. It also ensures changes can be made to

rules during processing by the OFR — so long as they meet the "logical outgrowth" requirement — without the burden of another round of notice and comment. *See Kennecott*, 88 F.3d at 1206 (explaining the ability of "agencies to correct mistakes and even to withdraw regulations until virtually the last minute before public release . . . helps assure that regulations appearing in the Federal Register are as correct as possible in both form and substance").

The NCAE's view that once an agency releases a rule to the public "it is instantly final," Reply Br. 23, does not offer comparable clarity. On the contrary, it raises the question, what precisely constitutes release to the public if not official public inspection. Here the agency conducted a "stakeholder briefing" and posted an unofficial version of the rule to its website with caveats. What if it had done one but not the other? Does it matter how many people joined the stakeholder call or the level of traffic on the agency website? Is the precise wording of the disclaimer controlling? What if none of the above occurred but an agency official "tweeted" about the rule? (The NCAE indicated to the district court that a tweet could render a rule final, Mem. in Opp'n to Defs.' Cross-Mot. for Summ. J. at 15). Does it matter how members of the public subjectively react to the announcement? Or, in this case, that the President and CEO of the NCAE may have found it "questionable" whether the rule would come into force given the presidential transition and "the incoming administration's 60-day regulatory freeze"?

The applicable statutory and regulatory scheme does not require or even tolerate a subjective analysis when determining the finality of a substantive rule. It instead sets forth an orderly process by which substantive rules are finalized and officially made available to the public when the OFR files them for public inspection. Because the 2021 Rule was a substantive rule that was not filed on the public inspection docket, it was

not final for purposes of the notice-and-comment requirements of the APA.

### III.  Conclusion

For the reasons stated, the judgment of the district court is, therefore,

*Affirmed*.